UNITED STATES of America, Appellee,

v.

Donald STEFFEN, Appellant.

No. 80–1346.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 12, 1980.

Decided Feb. 19, 1981.

Rehearing Denied March 13, 1981.

Murry A. Marks, Clayton, Mo., for appellant.

Robert D. Kingsland, U. S. Atty., Mitchell F. Stevens, Asst. U. S. Atty., St. Louis, Mo., argued, for appellee.

Before HENLEY and McMILLIAN, Circuit Judges, and BECKER,* Senior District Judge.

McMILLIAN, Circuit Judge.

Donald Steffen appeals from his conviction in district court[1] of four counts of misapplication of bank funds in violation of 18 U.S.C. § 656, and one count of making a false entry in a bank report in violation of 18 U.S.C. § 1005. Steffen was sentenced to three years imprisonment on each misapplication count, to run concurrently, and three years probation on the false entry count, to run consecutively. For the reasons discussed below, we affirm.

The Citizens Bank (the Bank) is located in Shelbyville, Missouri. In 1978 it was insured by the Federal Deposit Insurance Corporation (FDIC) and had assets which exceeded $8,400,000. In July of 1977, Steffen purchased 80% of the common stock of the Bank. He installed himself as president of the Bank and took an active role in the Bank's operations until he sold his stock in August of 1978. During his association with the Bank, Steffen also owned and operated a large farm as well as Steffen Seed Service.

Count I of the indictment dealt with a Bank loan to Glenn R. Woody and L. M. Jennings. Woody and Jennings ran a wholesale automobile business, which they financed in part through loans at the Bank. On April 27, 1978, Steffen went to their place of business and asked them for a personal loan of $47,500. After being told that they did not have that much money, Steffen proposed they obtain the money from the Bank. Steffen told them that, if they would sign a note, the Bank would loan them the money to give to him. Steffen promised that he would repay the loan to the Bank. Woody and Jennings testified that they agreed because they thought that doing a favor for Steffen would improve their credit at the Bank.

The following day Woody and Jennings went to the Bank and signed a 45-day unsecured note for $51,000 ($47,500 plus $3,500 that Steffen already owed them). Although Woody and Jennings had only a $15,000 line of credit, Steffen told the cashier of the Bank, Frederic Werr, that he

---

* The Honorable William H. Becker, United States Senior District Judge for the Western District of Missouri, sitting by designation.

1. The Honorable Edward L. Filippine, United States District Judge for the Eastern District of Missouri.

approved the loan because Woody and Jennings needed it to purchase a used car lot and a service station. They deposited the proceeds in another bank and wrote Steffen a check for $47,500. Steffen deposited the $47,500 check from Woody and Jennings in his Steffen Seed Service account at the Macon Atlanta Bank to cure an overdraft.

Counts II, III and IV dealt with loans that Steffen made to three of his daughters. In May of 1978, the Macon Atlanta Bank called in $150,000 in loans to Steffen because Steffen had disposed of the collateral securing those loans. On May 18, 1978, Steffen brought two of his daughters to the Bank. Barbara K. Steffen, who was sixteen years old, and Sherry Steffen, who was eighteen years old, were both single and lived with their parents. Steffen told Werr that he was going to loan each daughter $80,000. Werr protested that the loans would be considered an insider transaction for Steffen's benefit, that they would be considered as a single loan which would exceed the Bank's legal lending limit of $148,000, and that Barbara was not old enough to legally sign a note. Steffen responded that the loans would be paid off before the FDIC bank examiners arrived. Steffen directed Werr to make out unsecured $80,000 notes to each of these daughters. Then $151,652.06 was used to pay the principal and interest on Steffen's own loans, and the balance of $8,347.94 was deposited in the Steffen Seed Service account.

During May of 1978, Steffen Seed Service was overdrawn on a daily basis. On May 23, Steffen brought a married third daughter, Theresa Novinger, to the Bank. This time Steffen had Werr prepare an unsecured note for $125,000 which was signed by the daughter. The proceeds of the note were deposited in the Steffen Seed Service account.

Count V was occasioned by an examination of the Bank by the FDIC. The examination began at 8:00 a.m. on May 30, 1978, and continued through June 16, 1978. The examiners, following their standard procedure, took possession of the Bank's outstanding notes and the minutes book of its board of directors. They discovered that notes to Steffen's three daughters not only were unsecured but also had not been approved by the board of directors.

On the first day of the examination, Steffen arrived at the Bank accompanied by his attorneys. Steffen told Werr that his attorneys had advised him to get approval from the board of directors on the loans to his daughters. At Steffen's request, Werr gave him a piece of paper for the minute book of the board of directors. Steffen had minutes typed which purported to record that the loans were approved at a special meeting on May 15, 1978. Steffen also directed Werr to get the daughters' notes from the bank examiners so that Steffen's wife could place collateral on them. In addition, Steffen had a fourth note for $80,000 prepared in the name of Deborah Lynn McGee, another married daughter. No proceeds were issued on this note; instead, it was used to replace the note of the sixteen-year-old daughter.

On June 15, 1978, three days after the $51,000 note came due, Steffen gave Woody and Jennings an $11,000 check drawn on his Steffen Seed Service account and told them to apply it to the overdue note because the FDIC was examining the Bank. They did so. Accordingly, the principal on the note was reduced to $41,000, the interest to date was paid and the note was extended to June 23, 1978.

The Missouri Finance Commission suggested that it would be in the best interests of the Bank for Steffen to withdraw. During negotiations to sell the Bank to Gary Dickinson, its current owner, Steffen stated that he would buy the balance of the Woody and Jennings loan and that he would be responsible for paying the loans to his daughters. No principal or interest payments were ever made, however, on the $285,000 in loans to Steffen's daughters. When those notes came due, a replevin suit was filed. The Bank's bonding company paid $161,000 of the outstanding balance, with the remaining $124,000 coming from the collateral that Steffen's wife placed on the notes after the bank examiners arrived.

As of the date of trial, the Woody and Jennings note still had an outstanding balance of $41,000.

## I. *Brady* Material

On appeal Steffen first contends that the government failed to disclose certain reports and memoranda by FDIC bank examiner Jarvis and FBI special agent Clapp within such time as to allow defense counsel to effectively use and evaluate it. Steffen alleges that these materials, which concerned insider loans by the Bank's former owners, would have augmented his presentation of the defense of lack of criminal intent. Specifically, he says that the FDIC's previous condoning of insider loans in excess of the legal lending limit and subsequent formal approval led him to believe that such practices were legal.

The government says that there was no *Brady* violation for two separate reasons. First, Steffen had prior personal knowledge of the former owners' activities, which were the subject of the reports. Second, Steffen subpoenaed and received the reports prior to trial. We agree.

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), stands for the following principle:

[S]uppression by the prosecutor of evidence favorable to an accused upon request violated due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87, 83 S.Ct. at 1196. This court has applied a three-pronged test in finding *Brady* violations: (1) suppression by the prosecutor after a request by the defense (2) of evidence favorable to the defendant (3) which was material to his defense. *United States v. Smith*, 552 F.2d 257, 261–62 (8th Cir. 1977). The essential fairness of the procedure—not the diligence of the defense counsel or the good or bad faith of the prosecutor—is the key issue. *Castleberry v. Crisp*, 414 F.Supp. 945, 950 (N.D.Okl.1976). Because determining whether a jury would have attached significance to any piece of suppressed information or whether the defense's preparation and strategy would

have been different had counsel known about the evidence requires speculation by the court, the requirement that the evidence be favorable is not to be applied harshly or dogmatically. *Levin v. Clark*, 408 F.2d 1209, 1212 (D.C.Cir.1967). Omitted evidence is material where it "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). "In deciding what evidence should be supplied, the prosecution must resolve all doubts in defendants' favor." *United States v. Countryside Farms, Inc.*, 428 F.Supp. 1150, 1154 (D.Utah 1977). And the exculpatory evidence must be made available enough in advance of trial to allow its evaluation, preparation and use at trial. *United States v. Germain*, 411 F.Supp. 719, 724 (S.D.Ohio 1975). The prosecution is not required, however, to disclose to the defendant information which the defendant already knows. *United States v. Young*, 618 F.2d 1281, 1287 (8th Cir.), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1043, 62 L.Ed.2d 771 (1980). "[I]t is clear that the *Brady* rule applies only to favorable evidence which the prosecution has but which is unavailable to the defendant." *DeBerry v. Wolff*, 513 F.2d 1336, 1340 (8th Cir. 1975).

In the fall of 1977, shortly after he bought the Bank, Steffen was contacted by the FBI, and he and his attorney went to the United States Attorney's office in connection with an investigation of the former Bank owners. He made three more trips to testify about the former owners, and his attorney had numerous other contacts with the United States Attorney's office. Steffen also testified that he assisted the FDIC examiner and an FBI agent in putting together an investigative file to be presented to the United States Attorney. No action was ever taken against the former owners; the United States Attorney declined to prosecute because of deficiencies in the evidence.

Steffen received, through discovery, a copy of the 1978 FDIC report of examination of the Bank. On March 10, 1980, Steffen requested that the trial court issue a

subpoena to the FDIC for similar reports for the years 1977 and 1979, to assist him in the preparation of his defense. The subpoena issued on that date. The reports were received and retained by the court. Steffen's attorney was able to inspect them and have some items copied on March 27 or 28. In response to a question by the court at that time, Steffen's attorney stated that he did not believe there had been a *Brady* violation.

■ Even if we assume arguendo that the evidence in the reports was favorable[2] to defendant and material to his defense, this contention must fail. Steffen had personal knowledge of the former owners' activities, as he had helped compile the reports in question. Therefore, no disclosure was required under *Brady*. Further, the reports themselves were not suppressed. Steffen received the reports before trial.[3] The *Brady* rule does not apply to evidence which is available to the defendant. Thus, there was no *Brady* violation.

## II. Continuance

The government made a motion in limine to limit testimony about criminal activities and bad management by the prior owners of the Bank. Subsequently, Steffen advised the court that he wished to make a motion to dismiss the indictment on the ground of selective and discriminatory prosecution. On the first day of trial, the court allowed Steffen to present his motion orally and held a hearing, after which the motion was denied. The court declined to rule prospectively on the government's motion in limine, preferring to rule on each line of questioning separately as the trial progressed.

---

**2.** In fact, the converse seems to be true. The reports would have undermined his condonation theory. Certainly, activities of the Bank's former owners, which were doubtful enough to occasion investigation by the FBI and FDIC, should not have been chosen by Steffen as a model for his own conduct.

**3.** Steffen says that his access was not timely. But, without setting precise limits, we can say that timeliness was not a problem here. See guidelines in *United States v. Deutsch*, 373

Steffen says that the government's motion in limine bore directly on his discriminatory prosecution motion. Steffen now contends that the court should have continued the trial so he could respond to the government's motion in limine and could develop his discriminatory prosecution claim. Steffen had not requested a continuance.

■ A party who wants a continuance must make a proper motion for one. *See Wyrough & Loser, Inc. v. Pelmor Laboratories, Inc.*, 376 F.2d 543, 548 (3d Cir. 1973). Whether to grant a motion for a continuance is within the broad discretion of the trial court. *United States v. Lankford*, 573 F.2d 1051, 1054 (8th Cir. 1978). Claims which were not made before the trial court will not be considered for the first time on appeal. *United States v. Librach*, 536 F.2d 1228, 1231 (8th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976).

■ This issue was not preserved for appeal. Nor has Steffen alleged any facts which would constitute plain error or abuse of discretion in the court's not ordering a continuance *sua sponte*. Therefore, the contention fails.

## III. Evidence of Activities of Former Owners

Steffen contends that the trial court erred in restricting evidence concerning activities of the prior owners, which evidence would have supported his lack of criminal intent defense. He says, further, that uncertainty about what testimony would be permitted hampered his cross-examination on that issue.

F.Supp. 289 (S.D.N.Y.1974). Where defendant had knowledge of the contents of the reports and had himself subpoenaed those reports, any hypothetical changes in trial strategy should have been under consideration from the first moment that the theory of the defense was conceived. *Cf. United States v. Barron*, 575 F.2d 752 (9th Cir. 1978) (on notice before trial that alibi witnesses might be barred for defendant's failure to respond to government request for notice of alibi witnesses).

In a prosecution for willful misapplication of bank funds, the question of intent is of supreme importance, and testimony bearing on the issue of the defendant's good faith should not be excluded. *United States v. Cleary*, 565 F.2d 43, 47 (2d Cir. 1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978). Intent to injure or defraud a bank is a fact question for the jury. *United States v. Schoenhut*, 576 F.2d 1010, 1024 (3d Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978). It is settled that custom and practice may be relevant to intent in a misapplication of bank funds prosecution.[4] *United States v. Riley*, 550 F.2d 233, 236 (5th Cir. 1977). The issue here, however, is whether the trial court abused its discretion in excluding otherwise relevant evidence on grounds of prejudice, confusion or waste of time under Rule 403 of the Federal Rules of Evidence.

Jarvis and Werr were cross-examined as to what they told Steffen about the practices of prior owners regarding insider transactions and approval of minutes. Werr testified that he had told Steffen in Jarvis's presence that the prior owners made insider loans in excess of the Bank's legal limit and that it had been their practice to receive approval after the fact. Mr. Hickman, who had been an accountant for the Bank as well as director of another bank, testified that he was not aware from his experience that either insider loans or loans to minors were illegal. The above testimony bore on custom and practice. Therefore, the case is not comparable to *United States v. Riley, supra*, 550 F.2d 233, which required reversal because all evidence of custom and practice had been excluded.

The crux of this contention, then, is that Steffen was not permitted to put in evidence about the FDIC investigation of the prior owners. This evidence was properly excluded under Rule 403, on the ground of confusion of issues. *See United States v. Tidwell*, 559 F.2d 262, 266 (5th Cir. 1977), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978) (evidence that bank recovered its investment confused issue of intent to defraud); *United States v. Johnson*, 558 F.2d 744, 746 (5th Cir. 1977), *cert. denied*, 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978) (evidence of overpayment due to overlooked deductions confused issue of willfully falsifying tax returns). The investigation of the prior owners dealt with transactions wholly distinct from those charged in Steffen's indictment. Since evidence of custom and practice was already before the jury, the only effect of the excluded testimony would have been to lead the jury to speculate on whether the other transactions were violations and why the former owners were not prosecuted. Such speculation would have been irrelevant to Steffen's state of mind. The failure to prosecute others would not have exculpated Steffen.[5] The tendency of this evidence to confuse the issues outweighed its probative value. The trial court did not abuse its discretion in excluding this evidence even though it was related to custom and practice.

## IV. Sufficiency of the Evidence

Steffen contends that there was insufficient evidence to support his conviction on Count V of making a false entry in a bank report. The evidence showed that, on May 30, Steffen requested from Werr a piece of paper for the minute book of the board of directors, then later returned with typed minutes for a nonexistent May 15 board of directors meeting, which minutes he directed Werr to present to the directors for signatures. Steffen claims that there was no proof he prepared the minutes and that, because he did not personally present the false entry for signature or physically insert it into the records of the Bank, there

---

4. As the *Riley* court stated, "His defense may or may not be reasonable to a jury, but we believe that he should have the right to present it." *United States v. Riley*, 550 F.2d 233, 238 (5th Cir. 1977).

5. The fact that some murderers are not prosecuted does not make murder any less a crime. *See* note 2 *supra*.

is no evidence to support the conclusion that he made the false entry.

The essence of the offense is making or causing to be made a bank entry which represents what is not true or does not exist. *United States v. Welliver*, 601 F.2d 203, 208 (5th Cir. 1979). By reason of the jury's finding of guilt, the government is entitled on appeal to the benefit of all reasonable inferences from the evidence, and any conflicts in the testimony are to be resolved in favor of the verdict. *United States v. Knife*, 592 F.2d 472, 475 (8th Cir. 1979).

Here, there was ample evidence from which the jury could have inferred that Steffen knew the minutes made false representations [6] and that he caused the minutes to be entered in the Bank's records. These inferences were reasonable. There was sufficient evidence to support the conviction on Count V.

Steffen likewise contends that there was insufficient evidence to support the convictions on Counts I, II, III and IV because there was no showing that the loan recipients were financially unable to repay the loans or that they were not legally obligated to repay the loans.[7] Steffen relies heavily on language in *United States v. Gens*, 493 F.2d 216, 222 (1st Cir. 1974), which reversed a § 656 conviction on the grounds that the named debtors were financially capable and fully understood their responsibility to repay the loans. *Gens* and the other "bad loan" cases, however, involved bank officials who made loans to certain debtors knowing that the loans would go to third parties. Typically, such loans were held to be the result of poor judgment rather than willful misapplication. *E. g., United States v. Gallagher*, 576 F.2d 1028, 1046 (3d Cir. 1978) and cases cited therein.

A different situation is presented where, as here, a bank officer makes loans to putative borrowers, with the intent that the proceeds be used for his own benefit. The officer conceals his interest from the bank in order to circumvent the statutory limitations on insider loans. In such cases, courts have held that the financial condition of the putative borrower is irrelevant. *See, e. g., United States v. Twiford*, 600 F.2d 1339, 1341 (10th Cir. 1979); *United States v. Foster*, 566 F.2d 1045, 1049–50 (6th Cir. 1977); *United States v. Kennedy*, 564 F.2d 1329, 1338–39 (9th Cir. 1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *United States v. Cooper*, 464 F.2d 648, 652 (10th Cir. 1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 901, 34 L.Ed.2d 688 (1973). *Compare United States v. Docherty*, 468 F.2d 989 (2d Cir. 1972) (borrower who took out "personal" loan and gave bank officer the proceeds was not guilty of aiding and abetting in willful misapplication). Willful misapplication is established by the fact "that the loan was undertaken with intent to defraud the bank or to deceive its officers or examiners." *United States v. Krepps*, 605 F.2d 101, 106 (3d Cir. 1979).

The evidence at trial showed that Steffen arranged for the Bank to make loans to Woody and Jennings and to his daughters so that he could use the proceeds for his own benefit. The loans were so structured to deceive the Bank's officers or examiners. This evidence was sufficient to support his convictions under § 656.

## V. Cumulative Effect

Finally, Steffen contends that the cumulative effect of the claimed errors de-

---

**6.** Nor was the subsequent signing of the minutes by the board members a defense. Prior authorization or subsequent notification cannot legitimize a false entry made with the intent to deceive a bank examiner. *United States v. Stokes*, 471 F.2d 1318, 1321 (5th Cir. 1973); *United States v. Edick*, 432 F.2d 350, 353 (4th Cir. 1970); *United States v. Klock*, 210 F.2d 215, 216 (2d Cir.), cert. denied, 347 U.S. 960, 74 S.Ct. 710, 98 L.Ed. 1104 (1954).

**7.** We note in passing that the evidence would not have supported the affirmative of either of these conditions. First, most of the note to Woody and Jennings remains unpaid, and the loans to the daughters were settled in part by the Bank's bonding company and in part by the disposition of collateral. Second, witnesses testified that Steffen said he had assumed responsibility for repaying these loans.

598

nied him his right to a fair trial. The rule on cumulative effect has been formulated as follows:

> [T]his court may and will, where the case as a whole presents an image of unfairness which has resulted in the deprivation of defendant's constitutional rights, reverse even though none of the claimed errors is sufficient in itself to require reversal....

*Knapp v. United States*, 311 F.2d 71, 74 (5th Cir. 1962). The rule requires reversal where there is substantial prejudice to the defendant. *Id.* (reversal not justified); *United States v. Narciso*, 446 F.Supp. 252 (E.D.Mich.1976) (reversal based on prosecutorial misconduct); *People v. Burns*, 241 P.2d 308 (Cal.App.1952) (reversal based on hostility of trial judge). Steffen's trial did not present an image of unfairness. The cumulative effect, if any, of the claimed errors was not such as to deny him a fair trial.

Accordingly, the decision of the district court is affirmed.